Our next case is SHMIRLER v. KAPPOS SHMIRLER v. KAPPOS GARRETT GALSTER Thank you, Your Honors. Good morning. Good morning, Counsel. May it please the Court, my name is Garrett Galster, here on behalf of the Plaintiff's Appellee, Mr. Shmirler, in this case. Your Honors, I'm here today to ask you to reverse the decision for the Eastern District of Wisconsin, which granted the Patent Office's motion for summary judgment and denied my client's motion for summary judgment in this APA case. SHMIRLER v. KAPPOS Your Honors, the Patent Office... GARRETT GALSTER Your APA is this arbitrary and capricious standard. Are you saying that the Patent Office's rules, the MPEP rules, are arbitrary and capricious, or are you saying that the Patent Office's implementation of its rules is arbitrary and capricious? SHMIRLER v. KAPPOS Yes, Your Honor. I believe there are no present MPEP rules in play here, but it is the application in this case. The Office has denied Mr. Shmirler's right to proceed in front of it to maintain his patent rights. GARRETT GALSTER But he still doesn't have all of his co-inventors with him, right? SHMIRLER v. KAPPOS That's correct, Your Honor. GARRETT GALSTER Well, how can the Patent Office know what the inventors as they body wish? SHMIRLER v. KAPPOS That's a very good question, Your Honor. GARRETT GALSTER One of the inventors seems to have stopped payment on this many years ago and seems to not care that it be abandoned. GARRETT GALSTER And that's a very good point, Your Honor. And that precise action by the Patent Office in allowing a single inventor to proceed at that time is counter and contrary to… SHMIRLER v. KAPPOS What they're doing at that point is just enforcing the rule that you've got to pay for your patent processes. And when you don't pay for it, regardless of who takes the action, the rule says you don't get your patent issued, right? GARRETT GALSTER Your Honor, it was paid. SHMIRLER v. KAPPOS And before the ink was dry, he had rescinded the money and… GARRETT GALSTER There is zero… SHMIRLER v. KAPPOS …that there was no payment. GARRETT GALSTER Two points, Your Honor. Patent Office counsel in the Eastern District of Wisconsin has admitted at A913 lines 9 and 10 that the issue fee was in the hands of the Patent Office on the date the patent issued. SHMIRLER v. KAPPOS And then it was rescinded, what, the next day? GARRETT GALSTER Seventeen days later, the patent fees were allowed to be withdrawn by American Express purportedly. This is one aspect under the APA… SHMIRLER v. KAPPOS By the way, why did Portman do this? It's not in the record. GARRETT GALSTER Very good question, Your Honor. I have no idea. I can only speculate. SHMIRLER v. KAPPOS Okay, then don't speculate. Let's just go forward. GARRETT GALSTER But under the APA, that action by the office was counter to the evidence against the agency, which is one of the reasons, like under the Motor Vehicles Association case, that's one way in which agency action can be held to be arbitrary, capricious, or an abuse of discretion, when they act counter to the evidence before the agency. How did they act counter to the evidence before the agency? All that there is in the record from Mr. Portman is an indication that he was going to do anything he had to to get that patent issued, pay any fees he had to, fly to Arlington, Virginia to meet with the petitions examiner to get the patent issued. And furthermore, there is no evidence in the record that the patent office ever checked their accounting records to determine whether or not the fee that was purportedly returned to American Express was actually returned. SHMIRLER Well, they sent you a letter saying that the fee had been withdrawn. GARRETT GALSTER But there's no basis for that, Your Honor. SHMIRLER There's a letter that says the fee has been withdrawn. GARRETT GALSTER The letter from American Express to the patent office says – this was a May 2001 letter – SHMIRLER No, the letter from the patent office that says the fee has been withdrawn. GARRETT GALSTER And there's no evidence to that. There's no accounting. SHMIRLER You had a notice, as Judge Rayla said, in June of 2004, and nobody ever disputed that. I mean, usually these things, even assuming you're right, get cleared up in a more timely fashion because you get this notice from the patent office and there's some obligation on your part, if you're disputing this or think what they did is wrong, to come in. That was never done, correct? GARRETT GALSTER That is correct, Your Honor, and I will submit to you that the notice was inadequate, and here's why. Once a patent issues, the patent office says, big deal, the fee was given back, we gave the guy a chance to correct his error with an explanation. That's the office's position. It's equivalent to trying to right a wrong. It's a post hoc rationalization of their action. But they're expecting, then, that a patentee has the ability to even enter a power of attorney or withdraw a power of attorney. They don't. The rules don't talk to this. Rule, I believe it's 31 under the power of attorney, or 32, defines a power of attorney as a document by which a principal, and the principal is defined as a patent applicant, or an assignee of the applicant, or in a re-examination, patent piece. I guess I'm really not clear with the point you're making. You're saying… The point I'm making is that Mr. Schmerler was never notified of the notice from the patent office. So you're saying there was a power of attorney, saying that was somehow unlawful, that they didn't notify the right people? Is that what you're saying, that the June 2004 notice was kind of void because they didn't notify him? The power of attorney was executed and says through the issuance of the patent, is what the power of attorney says. It is very limited to the issuance of the patent. Now… Mr. Goldster, at the moment they send this notice which you contest, the patent is not vacated. If at that moment Mr. Schmerler had come forward instead of waiting two years, presumably he would have had a patent to, I don't know, handle in some way. Maybe he could have paid the fees or whatever he needed to do. Isn't it your inaction that causes this? Respectfully, it wasn't my inaction, counsel, but… Your client's inaction. Right, right. So my client was never notified, however, of the situation with the patent. He discovered it in May of 2005. That's when he discovered that something was going on with his patent. He was never sent any notice by Mr. Essman. So he waited two years and three months to come forward with that? Yes, Your Honor. Contacting the PTA? Yes, Your Honor, that is correct. Is there a problem with that? What's that? Is there not a problem with that? He honestly was having a rough time finding anybody to help him out with the case. That's what happened. But the distinction here between whether or not Mr. Schmerler is a patent applicant or a patentee is a key distinction that has to be resolved. Because if he's a patentee, he's got a unilateral right to protect his patent rights. It seems to me that your clients receive plenty of opportunity to rectify and try to resurrect or make the patent survive. And those inaction, those wrong action taken, there's excuses like your argument now that the inability to find somebody to help, that that's a defense here? No, Your Honor, not at all. My point is that the refund that was issued in this case was wrongful by the Patent Office. They had no jurisdiction to do so. They had no statutory authority to do so. And it was against their rules. That's my point. What's so difficult about getting the signatures of the co-applicants or the co-owners? Your Honor, it's not a record. But I can certainly explain if you'd like. It's not in the record. It's not in the record. But I can tell you. You said it's against their rules. How did they act against their rules? That would raise this to a different level of arbitrariness. Right. So if I could, could I start with the statutory lack of statutory authority? 35 U.S.C. Section 42D provides that the director may refund fees that are paid in excess of that required or by mistake. Neither of those instances have occurred in this case. Those fees were not paid by mistake as evidenced by Mr. Portman's repeated references to wanting to make sure this patent issued. Well, he didn't return anything. It was withdrawn by one of the inventors. It was actually withdrawn, Your Honor, by American Express. And we have no evidence that the- So this isn't a refund? I mean, why does that rule apply at all? Yeah, that's what I'm wondering too. Well, if the office had the money, my question is how is it not a refund? It was a transfer of money from the patent office back to someone that had paid the money and authorized it twice. I don't think the patent office transferred anything. It was just withdrawn, wasn't it, by the operation of financial institutions. That could be, Your Honor. I do not- You said a moment ago they violated their own rules. So I need to know what rule they violated and how. Certainly, Your Honor. There are specific rules in place by which an inventor may abandon his patent application or withdraw it from issue after the payment of a maintenance fee. Neither of those rules are followed. Rule 138 governs the express abandonment. Was the fee ever paid here? Yes, Your Honor. It was admitted in both the notice of the unsettled issue fee that was sent in June of 2004 that you mentioned, and it was also referenced throughout the exchange with the patent office with the Rule 182 petition. Do I pay a bill if I write a check and then call the bank and say, whatever you do, don't enforce that check? No, Your Honor. Have I paid that? No, Your Honor. I think, yeah, every understanding of commercial paper I have is that isn't payment. That's correct, Your Honor. The bounced check analogy is simply no analogy at all. The funds are never received by the patent office in that case. Not a bounced check. A withdrawn check. This is not a withdrawn check, Your Honor. No, no. Now, at A64, 664, we see that Dr. Portman notified or asked AmEx to withdraw the payment because of services that had never been received, meaning that the patent office never did do anything and therefore take my money back. Yes, Your Honor, and the patent office counters that in its notice of unsettled fee payment by saying, clearly, services were rendered. It's a dispute at this point between, as far as I'm concerned, American Express and the patent office, not between my client and the patent office. Those rules explicitly say, Rule 138 and Rule 313 is the other one for withdrawal, they explicitly say that a petition must be received under those rules and acted upon prior to issuance of a patent. That makes sense. In the case of Sampson v. Dan from 1978, that case, counsel for the patent office indicated that the office loses jurisdiction. It loses jurisdiction over the application the day that patent issues. Do you agree that the patent office has a right to not issue a patent if the fee is never paid? Yes, Your Honor. Well, what differences are here? They had the fee on the date of issue. The fee was never paid. It was withdrawn. No, Your Honor. It was paid, and they had it, and counsel admitted it. On the date the patent issued, April 10, 2001, that money, that $1,300. So during the application process, if the applicant pays a fee and then withdraws it, does the patent office have a right to not issue the patent? If the fee is withdrawn prior to issuance, certainly. Certainly, Your Honor. That's been held in cases such as Blacklight Power, even Sampson v. Dan. As long as the action is taken prior to the patent issuing, the office is within its jurisdiction to do so. But post-issuance, the office doesn't have any jurisdiction to do that, much less does it have jurisdiction to allow a third party… What if somebody writes a bad check? I write a check to the patent office, and they just have a bad accounting system, so they don't get around to cashing the check until after the patent is issued. And then they try to cash it after the patent is issued, and they find out it's void for insufficient funds. Is that what you're telling? Does the patent office then have the right to do what it did here, or no? It does, Your Honor, because they never had the money. This money was received, and this is evidenced in the record, that this money was received and in the PTO's account. And did they have control over them keeping it, or whether it was withdrawn? That, Your Honor, is a question regarding the business interaction between American Express and the patent office. And I'm not privy to that type of business arrangement. No, it's a question of whether Portman withdraws it, isn't it? And that's a question of the patent office's relation to an inventor who withdraws the fee, so their possession of that fee for a few hours was illusory, wasn't it? No, their possession of that fee was actual. Then they don't have the money. Where'd it go? They allowed it to be withdrawn from American Express, contrary to their rules, without jurisdiction. They allowed it. It was withdrawn. The rug was pulled out from underneath their feet, right? Again, my client doesn't care what the patent office does with its money. Your client kind of has to care, doesn't it? Because if your client doesn't take care to ensure that the fees are paid, it doesn't have a patent. So it's your responsibility to make sure the fee is paid. You didn't do it. Your Honor, with all due respect, it wasn't me, but the office... You have to kind of stand in his shoes. But the fee was issued, or the fee was there on the date of issuance, April 10, 2001. That's the end of the story as far as my client's concerned. They had the fee, the patent issued, the office lost jurisdiction. All right, let's hear from Mr. Krause. You had the money? Does that end this question? Whether or not you still have it is another question, but you had it at one point. Is that the end? I don't think so. It was subject to revocation by an action put into motion by Dr. Portman long before even the petition to revive the patent application was granted, much less the patent itself issued. I do want to emphasize that the decision before this court is the decision of the PTO that Mr. Galster cannot proceed unilaterally on behalf of Mr. Schmerler to resurrect this patent application. And that same decision applies whether this is a patent application or even a patent. So even if somehow we improperly vacated this patent and these individuals were actually patentees, the same reasoning applies. Mr. Galster can't come here and unilaterally represent Mr. Schmerler to try to get this patent reinstated. Again, we've explained we think it's a patent application, but even if it's a patent, the MPP is quite clear that all owners of the patent must come together to make a showing that the patent can be revived. Why did it take the Patent Office three or four years from the time it was charged back until the time the issue was announced? I don't have the answer to that. Mr. Schmerler speculates in his complaint at A11 that the reason we even found out about it in the first place was that we were preparing to send out a maintenance fee notice. Again, one of the problems was that the letter sent by American Express that's at A729 of the record that indicates that Dr. Portman had initiated a chargeback, that was sent back to Dr. Portman. It probably should have gone to the Patent Office to give us a chance to contest the chargeback. The first notice that we got that there was this chargeback at all was after the money had been withdrawn from our account that that May 2001 letter. At that point, the patent had issued. I'm not sure how the system works. I assume it's largely automated. Here there was a patent that had already issued. That withdrawal of the issue fee was not matched to this patent application until, as Mr. Schmerler points out, the maintenance fee came due several years later. That's when we noticed it. It's regrettable, and we've apologized to Mr. Schmerler. We didn't catch it earlier, but our system is not designed to do that. This is not a common occurrence that an inventor would withdraw the issue fee that way. But your bottom line is even if we buy a lot of what your friend on the other side said, it doesn't matter because he's still got to come in with the other co-inventors. Right. The very facts of this case prove that it's not arbitrary and capricious for us to require those other inventors here. As Mr. Schultz has pointed out, there's a lot we don't know. We don't know why Dr. Portman submitted that chargeback. We don't know. He may have done it at the time on behalf of all the inventors. He may have split the chargeback. We don't know these answers. That's part of the reason we need everybody, not just one inventor. It could be fairly telling in this case, the fact that the other two inventors are not joining. There's no evidence that Mr. Galtzer or Mr. Schmaror has tried to contact the other inventors directly or even Mr. Espen. These are the people who would know best what the circumstances of the abandonment were about. They'd know maybe something about Dr. Portman's chargeback. They might know also something about the inventor's joint failure to respond to the June 2004 notice. That doesn't matter in your case. Even if it's as benign as peanut butter, it doesn't matter because the Patent Office, our question is whether or not the Patent Office is arbitrary and requires an official contact. That's correct. That's absolutely correct. I will correct one thing in case it becomes important that Mr. Galtzer said. He said specifically in the argument here, it's the first time I've ever heard him say it or seen it in writing anywhere, that Mr. Espen did not tell Mr. Schmaror about the notice. I have no knowledge as to whether that's true or not, but that's not in the record. I feel like the pleadings up until now have avoided taking a position on whether Mr. Schmaror was informed or not. But even if he wasn't informed, as the District Court points out, maybe Mr. Schmaror has a remedy here, but maybe it's against Mr. Espen, not against the Patent Office. All right. Thank you, Mr. Krauss. Mr. Galtzer, we'll give you a minute. Thank you. Yes, Your Honor. In rebuttal, the point that Mr. Schmaror cannot proceed without his other inventors at this point is mooted if, in fact, he's a patentee. I made the argument in the briefs that if he's a property owner, he does have, in fact, that unilateral right. We were unable, both Mr. Krauss and I, were unable to find any cases like this that have ever surfaced regarding a withdrawal in this manner where the fees were given back after the patent issue. And I would say that under 35 U.S.C. 151, that statute clearly says that upon payment of the issue fee, which they admit happened, the patent is to issue. It did issue validly, dually, and should be reinstated. Thank you, Your Honors. Thank you, Mr. Krauss.